All right, our seventh case for today is Saunders against Acting Commissioner Berryhill. Mr. Duncan. Good morning, Your Honor. Dana Duncan on behalf of Michael Saunders. This is a case arrest again on the issue of concentration, persistence, and pace and the sufficiency of the hypothetical question. Mr. Saunders was found to suffer from major depressive disorder and a borderline intellectual functioning. Before I delve into the specific facts, I just want to again point out why moderate limitations and concentration, persistence, and pace is such an important factor. The way that the Commissioner's regulations lay out the law in regards to Social Security is step one, do you have a severe impairment? Are you working? Step two, do you have a severe impairment? You take those severe impairments, you consider them against the listed impairments. If you have two marked, you qualify as a matter of law of having no work. If not, then they're supposed to convert those findings into a residual functional capacity and determine whether there's any work in substantial numbers. And so that's a difference. It's a higher standard at the mark than it is subsequently. When you're looking at moderate, it's seldom that you will ever see a moderate limitation in anything that will be work preclusive. But when you start adding a moderate limitation together with all of the other limitations, that you start having an erosion and pretty soon you may very well have a vocational expert testify to the fact that there are no jobs and the person would qualify at step five if they can't perform their past work. Now, I will point out too that the Commissioner has already established and laid out a roadmap for judges to follow. So this concept of that the court is imposing something here that the Commissioner can't handle is not the case. Are you speaking about the recent changes? The recent changes, Your Honor. The listing itself describes in detail what factors you're supposed to consider when you're assessing moderate limitations. It's under 20 CFR chapter 404 subpart P, appendix 112.00E3. That's impressive. We know you live with this, Mr. Duncans. Oh, yes. Anyway, it talks about initiating and performing a task you understand and know how to do, working at an appropriate and consistent pace, completing tasks in a timely manner, ignoring and avoiding distractions while working, and then it goes on in some more detail. If those sound familiar, it's because those are the same findings that are on the mental RFC form that the court has said that the narrative has to take into account when assessing section one of that form. They've said that you're supposed to consider those. Now, in this particular case, we have multiple medical opinions. We start by, admittedly, Mr. Saunders has a very poor treatment history. He lives up in the north woods of Wisconsin. He hasn't gone to the doctor very often, and when he does, there's very few records. So, of course, the DDB, the Disability Determination Bureau, sends him for a consultative exam, so they send him to see Dr. Desmondi in August of 2009. He does a memory test, the WMS3 and the YS4, which is a cognitive test. He comes out as having a full-scale IQ of 75, a working memory of 71, a processing speed of 79. Can I ask you, Mr. Duncan, I keep looking at the RFC. I mean, this is really about the RFC, right? Correct. Because that just gets carried over to the hypothetical question. I keep looking at this, and I think, what would one have added to what the ALJ said to ask the vocational expert the correct question? Putting to one side whatever the answer would have been, no jobs, a million jobs, anything in between. So, we already have it unskilled. We already have simple, routine, and repetitive. And if you've got concentration problems, it seems fairly reasonable to think that if something's simple, you don't need to concentrate as much to do it. Maybe the same is true of routine and repetitive. No fast pace. That sounds like pace. Should you ask for supervision of some kind to address distractibility? If you were writing this, you've been doing this for a long time, what does that RFC say? In this particular case, the problem is it says no fast-paced production. I understand. I'm asking you to write the good one, not to criticize the bad one. Sure. And in this case, there are two different things. One, you can use the list that I indicate that's there and go through and start noting some of the limitations. You can, and as I've done in my cross-examinations at hearings, and I do a couple hundred hearings a year at least, I will say, if you assume that the individual can, most of the time, or satisfactorily perform this, but the employer will notice, and then you create a long list of problems that the claimant has ultimately would affect because the sheer volume of them would be more preclusive. But I find this interesting because I did ask this question at one point in time, and that was to Dr. Carl Baderbush, the vocational expert. In the record at 700 and 701, Dr. Baderbush was a professor of vocational science at UW-Stout and taught most of the vocational experts in Wisconsin. And I asked him how he interpreted the stress or change limitation that was noted in both Dr. Desmondi and Dr. Sherman, the two doctors who actually examined Mr. Saunders. And he said that he would perceive that as being a potential that the person would lose productivity. So, in other words, that marked limitation when I then made it more cognitive that the person would seldom be unable to perform that. 10% of the time to 15% of the time, it'd be more preclusive because the person's going to be off and not doing productive work on a regular basis. And the reason for that, I'm just trying to figure out something. Because the ALJs are clearly grasping it. How do we describe the kind of things, the kind of work that this person could do? And one of the words that I think even the ALJ comes up with, somebody does, is the word, kind of the opposite of being able to concentrate well, is distractibility. And as I remember, Mr. Saunders sits there and plays with his phone when he's trying to watch TV. So, how does one address that in the workplace? Other than through supervision, for example, or through setting a goal of you have to do X number of operations per hour or something. But if the law were a checklist, and that's the problem that ALJs have. Ultimately, the problem comes in that you can't use catchphrases to encapsulate what a claimant has. You have to articulate it, and you have to write it. And you have to do a better job of writing your decisions and express what evidence supports it. You have to establish, one, what the claimant's limitation is. Two, what the claimant, or what evidence, or excuse me, how the judge arrived at it. And three, what evidence supports it. Isn't that what Dr. Melan Charbal was doing? I mean, he was identifying deficits and trying to translate them into something practical. He was trying, but he glossed right over the moderate limitation of concentration, persistence, and pace. He mentioned that that was a finding. He was doing nothing more than revolving or repeating the findings that were already made by Dr. Desmondi, and then just never addressed it specifically. So he kind of implied... Why isn't it sufficient for the ALJ to rely on those doctors' conclusions and the limitations that they have suggested? Because this is not like some of the cases where the ALJ is creating this on her own or coming up with these on her own. She's looking to these doctors and using what they have articulated. Why isn't that sufficient? Well, first of all, in this particular case, if you look at the testimony from the various doctors who were testifying at hearing, the medical experts, we have no idea what they reviewed or what the basis of their opinions are. And there's nothing in the record that supports where they came from. And we're giving deference to the commissioner's decision without having any basis in the record for some of this. Furthermore, the two doctors that we specifically had examined and according to the commissioner's own regulations are supposed to be given more weight are not given more weight. It seems that the commissioner wants deference under the OUR doctrine to their interpretation of the regulations only when it's convenient for the decision to be upheld. And unfortunately, that seems to be common in these cases. A state agency doctor, a consultative examiner, is spending anywhere from 6 to 12 minutes reviewing a file and writing his residual functional capacity assessment. It's kind of hard, and I can tell you this, from experience to getting an 800-page medical record and being able to really understand what's going on in 6 to 12 minutes. We'll accept that. Your time is up. All right. That's fine. Thank you. You should go. Your Honors, may it please the Court, Megan Hegal on behalf of the Commissioner of Social Security. Because counsel started with the new regulations, I'd also like to start there. I believe this is the first case since the Court has addressed an ALJ decision that explicitly applied these new mental impairment regulations. They went into effect in early 2017. And the new regulations really cure a problem that the Court has identified in the past, in that the prior regulations did not explicitly define what was meant by a moderate limitation in a mental functional area at steps 2 and 3 of the assessment. And now they do. The new regulations make clear that a moderate rating means that a person can independently, appropriately, effectively, and on a sustained basis function in a fair manner. Fair. It might not be the fastest worker, but fair in general usage means sufficient. And, you know, there's been concern in some of the prior cases about, well, how can a person that's easily distracted sustain even simple work if they have a problem with distractibility? But the new regulations make it clear that that is not moderate. That's marked or extreme. Marked is someone who has serious trouble in a domain, and extreme is someone that cannot function on a sustained basis. And although these are new in the regulations, but this is how the agency and the doctors have been applying these regulations since we had this rating scale since 1985. But I think it's really important that now these are actually in the regulations for the Court to look at these definitions and see when the ALJ, when Dr. Mullen-Carball, when Dr. Sherman are saying Mr. Saunders has a moderate limitation in this broad area at step two and three in concentration, that means he's still a fair employee in that area. To counsel's point about, you know... But how do you, just to be concrete, if somebody has problems of inability to concentrate, how would you articulate to a vocational expert? How would you, first of all, how would you phrase that in a residual functional capacity assessment in something that doesn't sound like jargon? And how, as a practical matter, would you convey that to a vocational expert? Well, I would push back just on the premise that unable to function or unable to concentrate because, again, we're not in that realm here. We're in moderate, which means he has a fair ability to concentrate. We can call it light, moderate, heavy, intense, you know, whatever you want. What are you trying to tell people about this person's functioning? And how are you getting that across? Because some jobs do require the ability to focus intensely on a problem for a sustained period of time. Other jobs, maybe you can watch a movie at the same time as you're doing it. And you're just, you know, throwing a few things in a bag and throwing a few things in the next bag or what have you. And there are lots of things in between. But how can we be sure that with Mr. Saunders, who seems to have his problems and his description of his part-time work certainly reinforces some of that, how do you know the vocational expert has really gotten the essence of the degree of his problem? You can't just say, oh, it's moderate. Because nobody knows what that means. That floats out there with no reference. Absolutely, I would agree with that 100%. And the regulations also make that clear that the adjudicators are not supposed to use terms like moderate because that's not helpful. And so to take a step back, this issue of moderate comes at Step 2 and 3 of the analysis to say, does this person have a severe mental impairment in the first place? If yes, is it per se disabling? No. Then the ALJ moves on to a totally separate inquiry of what is the residual functional capacity. And in this case, the ALJ had three medical opinions from testifying medical experts. And the ALJ told us what the ALJ relied on in crafting Mr. Saunders' residual functional capacity. She relied primarily on Dr. Mellon-Carball, who testified at one of the hearings. And Dr. Mellon-Carball said that he reviewed Dr. Desmondi's report. So counsel's point about, we don't know what the medical expert relied on is not the case. They all testified that they looked at the consulting examiner's reports and relied on them. Dr. Mellon-Carball only looked at the first one because they'd only done one at that time. So Dr. Mellon-Carball, who the ALJ gave the greatest weight to... Do we know what his expertise is in? I believe he's a psychiatrist. Is that in the record? No, he testified from California and I looked it up, so I don't know that I should say that. It's a little disturbing because if Dr. Mellon-Carball were an OBGYN, maybe he wouldn't be the right person to be talking about this. Fair enough. I don't know if it's in the record. He testified, there was no objection to his qualifications at the hearing, so I think that's all I can probably say to that point. No one raised any issue about that. But he testified at steps 2 and 3 Mr. Saunders has moderate impairment and then he gave a specific residual functional capacity opinion for a range of simple repetitive tasks. Now why did the ALJ not scold him for usurping the ALJ's role since the ALJs frequently scold medical professionals for going beyond the description of the medical situation and moving into the vocational implications of that medical situation. The ALJs say, well that's for us to say. I'm sorry, I don't understand. The ALJs frequently reprimand medical experts for in a sense, figuring out what vocational consequences flow from a given impairment. Well the medical expert is supposed to provide a residual functional capacity finding. He certainly should not be saying what types of specific jobs someone could be doing. But Dr. Mellon-Carball didn't do that here. He just gave a residual functional capacity finding, which the judge adopted corresponding limitations to. And there was also two other medical experts. But when we think of residual functional capacity, we think of can you lift 20 pounds, can you walk 5 blocks, can you concentrate, the whole set of mental criteria. It's not the RFC. That's the ALJ's job to come up with. The ALJ is ultimately responsible for determining the RFC. And the ALJs reprimand the doctors if they more or less do that. I don't think that's fair. I think the point of calling a medical expert is for the ALJ to ask the medical expert have you reviewed the available evidence? And can this person lift 20 pounds? And can they climb ladders? And can they work in a dirty atmosphere? All these questions that they ask. So in a mental impairment case, the issue is not going to be can he climb a ladder? It's going to be can he perform a simple task? Can he interact with people socially? What can he do? Those are all fine questions. Can he work on a factory floor? It's when it starts to translate into vocational that the problem comes up. I think this is analogous to what Your Honor was saying about the physical. He's saying from his area of expertise, this is what I think he can do based on Dr. Desmond's report. He has borderline functioning. He has some problems with frustration. But he can do simple repetitive tasks. And Dr. Mellon-Carball said that several times. The other medical expert, Dr. Sherman, had the benefit of both consulting exams. She also said he can do simple repetitive tasks. And the third doctor actually said he only had mild impairments in concentration and could even do mildly detailed tasks. So the ALJ looked at all three of these opinions and crafted a residual functional capacity finding that said he can do simple repetitive tasks with additional limitations that corresponded to these medical opinions. What more could the ALJ have done in this case? He did not make complaints to his doctors of mental health symptoms. He was getting treatment from a free clinic. He asked for referrals. He asked for medication for physical symptoms. He did not claim any limitations for mental health symptoms. The ALJ looked at the opinions of the three medical experts and crafted a residual functional capacity that accounted for their opinions. How much is the commissioner relying on the fact that Mr. Saunders seems to be capable of working the part-time job? The ALJ considered that. She considered that he was working part-time and in the course of summarizing his testimony talked about how he's able to read the point-of-sale system for how the waitresses put in their orders and things of that nature. And I think that is important that he had a demonstrated capacity to work. Although this is not a step-four case, she didn't say he can keep doing that because he did say he had some trouble adapting to those types of changes, but that he can do a simpler job. And I would just like to say that the court's three most recent decisions on this issue, the Burmester, Dudley and Josephic cases, have affirmed ALJ decisions that said that claimants with moderate limitations in concentration, persistence and pace can still perform simple, repetitive tasks. And in Dudley and Josephic, the court found it really critical that the plaintiff could not identify any additional limitations that were supported by the evidence that were not already included in the residual functional capacity finding. And the case is similar here and I would ask that you affirm the decision. Alright, thank you. Mr. Duncan, anything further? If you're out of time, I'll give you a minute. Alright. I would like to say that the I sat down for a minute and just crafted an RFC. Good, okay, I'm ready to hear it. So, claimant testified he loses focus. The individual should only occasionally work on projects that take more than two hours. Claimant has problems with people, so he should work in an environment that does not require working with others on a daily basis. He'll have bad days, and on those days he may be off task. He testified that those happen about three days per month. Some days he is in his daily activities report he's noted that he has two or three per month that he needs to have less stress and on those days he should be able to adjust his work demands and change his work. Okay, thank you. And on that note, thank you. Thank you so much. We will take the case under advisement, thanks to both counsels.